UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-61624-AHS

ROBERT J. MORRIS,

     Petitioner,

v.

RICKY D. DIXON, SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

     Respondent.

_____/

**REPORT AND RECOMMENDATION**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Robert J. Morris ("Petitioner" or "Morris") has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging the constitutionality of his conviction and sentence entered in the Seventeenth Judicial Circuit, Broward County, Case No. 14-14141CF10A (the "Petition"). *See* [ECF No. 1].[1] After reviewing the pleadings, the record, and otherwise being fully apprised, it is **RECOMMENDED** that the Petition [ECF No. 1] be **DENIED**.

**I.      FACTUAL AND PROCEDURAL HISTORY**

A.  Factual Background

Though well-developed in the record, the undersigned will briefly recount the underlying facts giving rise to the case. This case stems from the killing of Omar Khan ("Khan") by Petitioner on October 20, 2014. *State v. Morris*, 382 So.3d 717, 721 (Fla. 4th DCA 2024), *review denied,* No. SC2024-0492, 2024 WL 3273361 (Fla. July 2, 2024); [ECF No. 5 at 7].

---

[1] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

On October 20, 2014, Petitioner arranged to purchase Xanax from Khan in Coral Springs, Florida. *See* [ECF No. 5 at 6, 11]; *Morris*, 382 So.3d at 720; [ECF No. 7-3 at 143:21–144:17]. Petitioner testified that he had previously purchased drugs from Khan and knew that he would have Xanax. *See Morris*, 382 So.3d at 720; [ECF No. 7-3 at 143:21–144:17]. Petitioner was carrying a gun for protection at the time of the meetup, because he had been robbed recently. *See* [ECF No. 7-3 at 139:18–141:19]; *Morris*, 382 So.3d at 720.

Specifically, Petitioner contacted Khan on October 20, 2014, requesting Xanax on behalf of Petitioner's cousin. [ECF No. 7-3 at 141:21–142:14]. Khan responded asking Petitioner to pay money owed from a previous drug debt. *See Morris*, 382 So.3d at 720; [ECF No. 7-3 at 142:15–17]. Petitioner responded that he did not have enough funds with him at the time, and the parties resolved to meet at a CVS in Coral Springs, Florida located near a Bank of America. *See* [ECF No. 7-3 at 142:17–20, 145:5–8, 179:25–180:7]. Petitioner entered Khan's car outside the CVS and Khan admonished him for being late in paying the money owed. *See* [*id.* at 142:20–25]. Khan then drove Petitioner to a nearby Bank of America so Petitioner could withdraw money to reimburse him. *See* [*id.* at 144:24–145:12, 179:25–180:7]. Petitioner went into the bank and though he had deposited money in his account, which held a negative balance at the time, he did not have enough to reimburse Khan. *See Morris*, 382 So.3d at 720. Petitioner went back to Khan's car to inform Khan that he was unable to get the money. *See id.* Petitioner testified that at this point Khan became aggressive and started screaming "where my mother fucking money, where my mother fucking money." [ECF No. 7-3 at 143:11–14, 145:13–19]. Petitioner testified that he tried to exit the vehicle when Khan grabbed him while continuing to scream. *See* [*id.* at 146:3–25]. When Petitioner turned around, he saw Khan had produced a gun from his left side. *See* [*id.*]. Petitioner further testified that Khan started trying to pat down and go through Petitioner's pockets. *See* [*id.*].

At this time, Petitioner grabbed for Khan's gun while also drawing his own gun. *See* [*id.*]. Petitioner then shot Khan twice in purported self-defense, testifying that he was afraid for his life. *See* [*id.* at 147:1–4, 166:1–19].

As noted by the state appellate court, the only person to indirectly corroborate Petitioner's retelling of the events was witness Yu Lin ("Lin"), a Chinese man who did not speak English well. *See Morris*, 382 So.3d at 720; [ECF No. 5 at 24–25].  Lin, who was getting out of his car in the same parking lot, overheard two men arguing. *See Morris*, 382 So.3d at 722; [ECF No. 5 at 13]. At a postconviction evidentiary hearing, Lin further testified, through an interpreter, that he heard two gunshots during the argument. *See* [ECF No. 5 at 13]. After hearing the gunshots, he saw two men get out of the car. *See* [*id.*]. The driver (Khan) exited the car first and ran towards the bank. *See* [*id.*]. Lin testified that Khan was screaming very loudly in pain and holding his leg. *See* [*id.*]. Lin also saw the passenger (Petitioner) open the door and run away in the opposite direction of the bank. *See* [*id.*]. Lin's testimony that he overhead two men arguing in the parking lot was introduced at trial through an officer, Detective Young, who had canvassed the area and interviewed Lin. *See Morris*, 382 So.3d at 722; [ECF No. 7-4 at 113:7–17]. Lin never directly testified at Petitioner's trial, and the testimony that he heard the gunshots and witnessed Khan exit the car in pain was not introduced at trial. *See* [ECF No. 5 at 21–22].

After Petitioner shot Khan, another witness saw him crouching behind Khan's car attempting to hide a gun under his shirt. *See* [*id.* at 7]. After Petitioner ran from the bank, he was picked up by his cousin, who was driving Petitioner's car. *See Morris*, 382 So.3d at 720–21. Petitioner entered the car and sped off into a neighboring parking lot, where one of the men threw the gun from the car. *See id.* An officer spotted Petitioner's car leaving the parking lot, conducted a traffic stop, and identified Petitioner as the man seen by witnesses fleeing. *See id.* Officers, after

reviewing surveillance videos, noticed Petitioner's car stop briefly in a nearby preschool parking lot before exiting the area. *See* [ECF No. 5 at 8]. After searching where the vehicle stopped, they found a firearm pushed underneath a fence. *See* [*id.*].

Khan, returning to his car after walking towards the bank, drove to his house where his family called 911. *See Morris*, 382 So.3d at 721. Khan died from the gunshot wounds after EMTs took him to the hospital. *See id.*

### B. Trial Court Proceedings

Petitioner was charged with one count of Murder in the Second Degree with a Firearm for the murder of Khan and one count of Possession of a Firearm with the Serial Number Removed. *See* [ECF No. 5 at 1, 5–12]; [ECF No. 6-1 at 10–12]. Following a trial in 2016, Petitioner was found guilty of all charges. *See* [ECF No. 6-1 at 14–15]; [ECF No. 1 at 1]; [ECF No. 5 at 1]. Petitioner was sentenced to prison for sixty years with a twenty-five year mandatory minimum for the murder charge and one day in jail for the possession of a firearm charge. [ECF No. 6-1 at 17–20]; [ECF No. 5 at 1–2].

### C. Direct Appeal

Petitioner appealed his conviction and sentence, and on October 12, 2017, Florida's Fourth District Court of Appeal affirmed the trial court's judgment and sentence in a *per curiam* opinion. *See Morris v. State*, 232 So.3d 1031 (Fla. 4th DCA 2017); *see also* [ECF No. 5 at 2]; [ECF No. 1 at 2].

### D. *Rule 3.850* Motion

On October 27, 2017, Petitioner filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. *See* [ECF No. 5 at 2]; [ECF No. 6-1 at 110–23]. Petitioner's Rule 3.850 motion was based on six claims of ineffective assistance of counsel. *See*

[ECF No. 6-1 at 110–23]. Petitioner subsequently withdrew his motion for postconviction relief. *See* [ECF No. 5 at 2]; [ECF No. 6-1 at 132–36].

On October 31, 2018, Petitioner, through counsel, filed a second motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. *See* [ECF No. 5 at 2–3]; [ECF No. 6-1 at 138–65]. Petitioner's second Rule 3.850 motion was based on four claims of ineffective assistance of counsel and one claim of cumulative error. *See* [ECF No. 5 at 2–3]; [ECF No. 6-1 at 138–65]. The postconviction court denied the Petitioners motion for postconviction relief on all five claims for failing to meet the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984). [ECF No. 5 at 3]; [ECF No. 6-1 at 187–89]. Petitioner appealed the motion's denial to the Fourth District, and the court reversed the denial on grounds that the postconviction court failed to attach records to support the denial. *See Morris v. State*, 287 So.3d 634, 635 (Fla. 4th DCA 2020).  On remand, the postconviction court ordered an evidentiary hearing be held on the reversed motion. *See* [ECF No. 6-1 at 226–27]. After conducting a hearing, the postconviction court granted relief on grounds two, three, four, and five of the motion, and denied relief on only one ground. [ECF No. 6-2 at 102–24]. The State appealed the ruling, asserting the postconviction court erred in granting relief on the four grounds. [ECF No. 6-2 at 126–169]. The Fourth District Court of Appeal agreed and reversed on all four grounds. [ECF No. 6-2 at 238–49]; *see also State v. Morris*, 382 So.3d 717 (Fla. 4th DCA 2024).  Petitioner sought discretionary review with the Florida Supreme Court, which was denied. [ECF No. 6-2 at 251–52, 285–86].

E.  Instant Petition

Petitioner filed the instant § 2254 petition and raises following four claims:

> **Claim 1**: Counsel was ineffective for failing to call Yu Lin as a witness to corroborate Petitioner's version of events.

> **Claim 2**: Counsel was ineffective for failing to memorialize and present the testimony of Joseph Williams.

5

**Claim 3**: Counsel was ineffective for agreeing to the admission of an inflammatory video of Petitioner.

**Claim 4**: Counsel was ineffective from multiple omissions of counsel, which constituted cumulative error.

*See generally* [*id.*].

## II.    STATUTE OF LIMITATIONS AND EXHAUSTION

The parties agree that the petition was timely filed, and the Court's review confirms timeliness. *See* [ECF No. 1 at 25]; [ECF No. 5 at 3–5]. Respondent concedes that all claims have been properly exhausted. [ECF No. 5 at 5–6].

## III.    LEGAL STANDARD

### A.  Standard of Review

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1)'s "contrary to" clause, courts may grant the writ if the state court: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under its "unreasonable application" clause,

6

courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413. "[C]learly established Federal law" consists of Supreme Court "precedents as of the time the state court renders its decision." *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (citation and emphasis omitted).

An unreasonable application of federal law differs from an incorrect application of federal law. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation omitted). Under this standard, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Courts "apply this same standard when evaluating the reasonableness of a state court's decision under § 2254(d)(2)." *Landers v. Warden*, 776 F.3d 1288, 1294 (11th Cir. 2015) (citations omitted). That is, "[a] state court's . . . determination of the facts is unreasonable only if no fairminded jurist could agree with the state court's determination . . . ." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (citations and internal quotation marks omitted).

Under § 2254(d), where the decision of the last state court to decide a prisoner's federal claim contains no reasoning, federal courts must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "It should then presume that the unexplained decision adopted the same reasoning." *Id.*

B. Ineffective Assistance of Counsel Principles

To establish a claim of ineffective assistance of counsel, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. at 687. To prove deficiency, he must show that counsel's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. To prove prejudice, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

It is "all the more difficult" to prevail on a *Strickland* claim under § 2254(d). *Harrington*, 562 U.S. at 105. As the standards that *Strickland* and § 2254(d) create are both "highly deferential," review is "doubly" so when the two apply in tandem. *Id.* (citation omitted). Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Id.* Rather, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner has the burden of proof on his ineffectiveness claim, *Holsey*, 694 F.3d at 1256, as well as the burden of proof under § 2254(d), *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted).

## IV.   **DISCUSSION**

A. Claim 1: Failure to Call Witness Yu Lin

First, Petitioner argues that his trial counsel was ineffective for failing to call Yu Lin as a witness to corroborate Petitioner's version of events. Petitioner states that Lin was present during the shooting and that if he testified, he would have supported Petitioner's theory of self-defense. *See* [ECF No. 1 at 8]. According to Petitioner, Lin "was prepared and willing to testify that,

8

immediately prior to the shooting, Khan was acting aggressively[,]" and that Petitioner "had been confronted by an angry, yelling, firearm-wielding Khan who was upset about being shorted money from a prior drug debt." [*Id.* at 8–9]. Petitioner also asserts that Lin was available to testify and that "Petitioner, with Yu Lin's testimony, was proceeding to an acquittal" and "[b]ut for counsel's failure to act, the outcome of the Petitioner's jury trial would have been different." *See* [*id.* at 10].

Respondent argues that Petitioner's ineffective assistance of counsel claim implicates trial strategy, which does not constitute deficient performance. *See* [ECF No. 5 at 24–25]. Additionally, Respondent states that "counsel investigated Lin's possible testimony, considered the advantages and disadvantages of calling Lin, and rejected calling Lin based on an informed judgment that any probative value of Lin's testimony was minimal and did not outweigh the prejudice of additional testimony sympathetic to the victim." *See* [*id.* at 25]. Moreover, Respondent claims that the only fact in which Lin could testify to support Petitioner's self-defense theory, that Petitioner and Khan were arguing before Petitioner shot Khan, was instead strategically elicited from Detective Young. *See* [*id.* at 24–25]. Respondent further argues that there was no prejudice to Petitioner as "[a]ny benefit of corroboration by Lin on this point would have been outweighed by testimony of Lin that would undermine Morris's theory of events . . . [t]hus, there is no reasonable probability calling Lin would have resulted in a different verdict." [*Id.* at 27–28].

In his reply, Petitioner contends that the argument that Lin's testimony was only useful to corroborate Morris' claim that Petitioner and Khan were arguing prior to the shooting "significantly downplays only half of the issue." *See* [ECF No. 11 at 1]. Petitioner argues that Lin's testimony would not only have been useful to show that Morris and Khan were arguing, but that "Yu Lin hearing the gunshots corroborates Morris' testimony that he was trying to exit an open car door when he fired." [*Id.* at 2]. Lastly, Petitioner claims that "Yu Lin was indispensable as an

ear witness and an eyewitness" and the failure to call him was ineffective assistance of counsel. [*Id.* at 4].

Petitioner raised this claim in his Rule 3.850 motion. [ECF No. 6-1 at 150–53]. The state appellate court rejected it stating that "[g]iven the high degree of deference afforded to trial counsel, the failure to call [Yu Lin] as a witness was not so objectively unreasonable to constitute constitutionally defective counsel." *Morris*, 382 So.3d at 726.

Here, the state appellate court reasonably rejected this claim. When evaluating a defense counsels' strategic decisions "[c]ourts must 'indulge the strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689–90). "First [w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Foster v. United States*, No. 19-21363-CIV, 2020 U.S. Dist. LEXIS 106159, at *16 (S.D. Fla. June 15, 2020) (quotations omitted). "To rebut the strong presumption that counsel's strategic decision not to call a witness was reasonable, 'a petitioner must establish that no competent counsel would have made such a choice.'" *Cardona v. Dixon*, 681 F. Supp. 3d 1280, 1301 (S.D. Fla. 2023) (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998)).

Petitioner's claim fails because Petitioner does not establish that his counsel's strategic decision not to call Lin to testify was something that no competent counsel would do. Fred Haddad ("Haddad"), Petitioner's trial counsel, testified that he took Lin's deposition. *See* [ECF No. 7-4 at 78:9–25]. During this deposition, Haddad learned that Lin heard "a bang, bang" and that he also "heard two males arguing loudly in the parking lot." *See* [*id.*]; [ECF No. 6-1 at 259]. Lin could not understand what was being said in the argument because he did not speak English well enough.

10

*See* [ECF No. 7-4 at 78:9–25]; [ECF No. 6-1 at 259]. Haddad testified that to support Petitioners' self-defense theory, he originally wanted the testimony that Lin heard the arguing. [ECF No. 7-4 at 113:7–17]. However, he was able to get the same information in through Detective Young, who had canvassed the scene after the shooting. *See* [*id.*]. Moreover, while Petitioner argues that Lin's testimony was important because he was the only one who heard the gunshots to support his self-defense theory, Haddad testified that the gunshot testimony from Lin was not important because the victim had undisputably been shot. *See* [*id.* at 113:19–23]. Moreover, Lin testified during the deposition that he saw the victim who had been shot, saw him in pain, and looking miserable. *See* [*id.* at 114:14–16]. Haddad explained that he did not want to elicit sympathetic testimony of Khan's injuries. *See* [*id.* at 114:18–115:6 ("[The testimony] would kill me. It would create sympathy for a kid. The kid is out there running with a bullet hole. It's prejudicial as hell for me. Why would I bring out what the prosecutor is supposed to be doing?")]; *see also Cardona*, 681 F. Supp. at 1306 (finding it was reasonable for attorney not to call a witness that "would have bolstered the State's theory").

Instead, Haddad, believing that he was more effective at cross-examination, chose to elicit the information that Lin heard the argument in the car from Detective Young, who had canvassed the scene. [ECF No. 7-4 at 113:7–17]. In doing so, Haddad got the testimony that Lin had heard the argument in the car without eliciting sympathetic testimony of Khan's injuries and subjecting Lin to cross-examination regarding the same. *See* [*id.* at 113:5–115:18].

Further, Petitioner has not provided any evidence that the decision not to call Lin would have resulted in a different outcome at trial, thus prejudicing him. *See Thomas v. United States*, 596 F. App'x 808, 811 (11th Cir. 2015) ("The movant cannot show prejudice if the omitted evidence is aggravating, cumulative, or incompatible with defense the strategy."); *see also*

*Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) ("[I]t is reasonable for a state court to conclude that a petitioner suffers no prejudice when the [new] evidence is either weak or cumulative of the testimony presented at trial.").

In sum, the state appellate courts' rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

B.   Claim 2: Failure to Present Testimony of Joseph Williams

Second, Petitioner argues that his trial counsel was ineffective for failing to memorialize and present the testimony of Joseph Williams ("Williams"). Williams was a close friend of Khan, who told investigators that he knew Khan sold drugs, he had previously obtained Xanax pills from Khan, that Khan had stolen bottles of prescription pills from Williams before, and that on the morning of the shooting, Khan had blamed Williams for getting Khan's parents to kick him out of their home over the stolen pills. *See* [ECF No. 5 at 28]. Petitioner's counsel had originally listed Williams as a witness and obtained his statement from investigators. *See* [*id.*].

Petitioner argues that Williams was "the only known witness who *might* testify about Khan's circumstances. [ECF No. 1 at 12]. (emphasis added).  Namely, Petitioner argues Williams knew of "Khan being a known drug dealer, [about] his desperation in the day or so leading to his death, his recent possession of Xanax (juxtaposed with having no Xanax at the eventual drug deal) -and- Khan's motive to meet Petitioner [] at a Coral Spring CVS" to ostensibly receive money from Petitioner to buy more Xanax. *See* [*id.*]. Petitioner argues that trial counsel "took no acts to memorialize the events that Williams' statement depicted[,]" and "was simply unversed in the evidence supporting Petitioner's defense." [*Id.* at 14]. Petitioner claims that these alleged failures

12

led to his "defense being fatally prejudiced." [*Id.*]. And had Petitioner been able to use Williams' testimony, he would be "progressing towards an acquittal." [*Id.* at 16].

Respondent responds that trial counsels' performance was not deficient for several reasons. First, Respondent argues that the failure to introduce Williams' testimony could not prejudice Petitioner because the testimony would have included inadmissible character evidence. [ECF No. 5 at 30–32]. Second, Respondent states that "Morris cannot show that counsel's failure to call Williams to testify [Khan] was a drug dealer would have an adverse effect on the judgment when the State [already] admitted [Khan] was a drug dealer and was there to sell drugs to Morris." [*Id.* at 33]. Third, Williams would have also testified Khan never carried a gun, which would have corroborated sympathetic testimony from Khan's mother and "would have further damaged Petitioner's otherwise unsupported claim that [Khan] pulled a gun on Morris, requiring Morris to defend himself by shooting [Khan]." *See* [*Id.* at 33]. Last, the Respondent argues that

> the record reflects Williams would have denied knowing whether [Khan] sold drugs, seeing [Khan] sell drugs, knowing [Khan] sold Xanax, that [Khan] stole Xanax bars from Williams, and knowing that the shooting was a drug deal gone bad. Counsel would have only been able to introduce these facts by calling Williams to impeach him with his prior sworn statement.

[*Id.* at 33–34] (citations omitted).

In his reply, Petitioner argues that Respondent mischaracterizes his argument and that Williams' testimony "would not merely show Khan was a criminal and a thief. It would have corroborated Morris' self-defense claim and woven Khan into the facts." [ECF No. 11 at 5–6]. Further, the Petitioner argues that "[w]ithout Williams, the State proceeded as if Khan was killed intentionally – as if during a planned killing." [ECF No. 11 at 6].

Petitioner raised this claim in his Rule 3.850 motion. [ECF No. 6-1 at 153–60]. The state appellate court rejected it, by finding "that [Petitioner] was not prejudiced." *Morris*, 382 So.3d at 726. The state appellate court did not address the deficiency prong of *Strickland. See id.*

Here, the state appellate court reasonably rejected Petitioner's claim for several reasons. First, the United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law[.]"). The Fourth District Court of Appeal interpretation of Florida evidentiary rules and its determination that Williams' testimony that Khan gave Williams drugs and stole Williams' Xanax was inadmissible character evidence is binding and will not be disturbed. [ECF No. 1-2 at 10]; *see also Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (declining to disturb a Texas habeas court's conclusion that a trial counsel's failure to attempt to introduce inadmissible extrinsic evidence of prior inconsistent statements under Texas Rules of Evidence did not amount to deficient performance). As it applies to the prejudice prong, "failure to make a meritless attempt at introducing evidence could not have prejudiced [Petitioner] because the evidence ultimately would not have been introduced." *Garza*, 738 F.3d at 677.

Petitioner further argues that the state appellate court did not consider the weight of the other possible testimony from Williams that depicted Khan's state of desperation, Khan's possession of Xanax, and the connection between the Xanax and the Coral Springs CVS pharmacy. [ECF No. 11 at 6]. However, Haddad himself testified that his goal in attempting to call Williams as a witness was to malign Khan's character:

14

Q: Let's talk about [Williams not being allowed to testify]. When this was brought up outside the presence of the jury, the possibility of Joseph Williams testifying, how did that get brought up to The Court?
A: She saw him outside.
Q: Who is she? I'm sorry, for the record.
A: [Opposing counsel]. And she knew I was going to call him, and she raised an objection because she said he had nothing relevant to say. It was past time, and he had no knowledge of the drug deal itself and it was irrelevant. I was trying to malign the character of the decedent.
Q: Okay.
A: And we had a debate back and forth, and I was hoping at least put an—truthfully, malign . . . the decedent. At least have something in there that he had been a drug dealer, at least in the past, and was more likely than not he was doing drugs this time. That's why he would have been there. And Robinson said no. Judge Robinson. Sorry.

[ECF No. 7-4 at 104:20–105:13].

Generally, evidence regarding a victim's character is inadmissible under Florida law. *See generally* Fla. Stat. § 90.404. Exceptions to this rule are where a victim's character is an essential element in the case, or where the defendant asserts he acted in self-defense. *See Munoz v. State*, 45 So.3d. 954, 956 (Fla. 3d DCA 2010). Though Petitioner's theory at trial was that he shot Khan in self-defense, the character evidence he sought to admit "must be relevant to resolve an issue as to either the victim's conduct or as to the reasonableness of the defendant's fear at the time of the incident." *See Munoz*, 45 So.3d at 956. Namely, a defendant may introduce reputation evidence in a self-defense case to show that the victim was the initial aggressor, or specific acts evidence to demonstrate the reasonableness of the defendant's fear at the time of the incident. *See id.* at 956–57. Here, testimony that Williams knew Khan sold drugs, previously obtained Xanax from Khan, and Khan had stolen drugs from Williams before the shooting would not be relevant to whether Khan was the initial aggressor or whether Petitioner was afraid for his life. Rather, as stated by Haddad, the main use of this testimony would be to malign Khan's character before the jury, in direct contravention of Florida law. *See* [ECF No. 7-4 at 104:20–105:13]; Fla. Stat. § 90.404.  Trial

15

counsel cannot be ineffective for failing to attempt or attempting to introduce inadmissible evidence. *See Ray v. Thomas*, No. CIV.A. 11-0543-WS-N, 2013 WL 5423816 at \*44 (S.D. Ala. Sept. 27, 2013), *aff'd sub nom. Ray v. Alabama Dep't of Corr.*, 809 F.3d 1202 (11th Cir. 2016) ("Counsel is not constitutionally ineffective under *Strickland* for failing to accomplish (or attempt) mission impossible by seeking to introduce evidence that is plainly inadmissible under applicable rules of evidence.").

Even if such evidence was admissible, Haddad was not deficient for omitting Williams as a witness because allowing Williams to testify would be contrary to the defense's strategy and be for the primary purpose of impeaching Williams with a prior sworn statement. As previously stated, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Foster*, 2020 U.S. Dist. LEXIS 106159, at \*16 (quotations omitted). Review of counsel's performance is "highly deferential, and we apply a 'strong presumption' that counsel's performance was reasonable and that all significant decisions were made in the exercise of reasonable judgment." *Thomas*, 596 F. App'x at 809 (quoting *Chandler v. United States*, 218 F.3d at 1314).  Here, Williams stated that he had never seen Khan with a gun. *See* [ECF No. 7-4 at 95:7–9, 102:6–9].  Petitioner argues that Williams should have nevertheless been called as a witness despite this testimony. *See* [ECF No. 1 at 6]; [ECF No 7-4 at 90:21–91:10]. Namely, Petitioner argues such testimony would not be prejudicial because Khan's parents had already testified that they had never known Khan to own a gun. *See* [ECF No. 1 at 16].

However, Haddad never intended to call Williams as a witness prior to the death of Khan's girlfriend, Rebecca Gromosaik. [ECF No. 7-4 at 101:6–16]. Haddad stated that "[i]t was difficult to put [Williams] on the stand" because Williams had never known Khan to carry a gun. *See* [*id.*

at 102:6–9]; *see also* [*id.* at 95:7–9 ("Because Rebecca, as [Williams]— you know, the only problem with it is, of course, Rebecca and [Williams] both said that they've never seen [Khan] with a gun.")]. Haddad further testified:

> Q: Now, based on your discussion with Mr. Morris about his version of the events, the discovery that you reviewed, the supplemental discovery that you reviewed, a lot of which we had discussed this morning and earlier this afternoon, did you formulate a strategy for Mr. Morris' defense?
> A: Obviously.
> Q: Okay. And what was that?
> A: That he fired in self-defense.
> Q: Okay. And can you detail how that came about?
> A: There was no other defense. It was a close range shooting. It would be straight-up, flatout murder unless you had a defense. And his defense was that he knew this kid. The kid had pulled a gun on him previously. And, you know, he fired in self defense.

[ECF No 7-4 at 90:21–91:10].

Therefore, evidence that Williams had never known Khan to own a gun would have been contrary to Haddad's self-defense strategy for Petitioner. And although Khan's mother had testified that she did not know Khan to ever possess a weapon, any further testimony as to this would have strengthened the argument against self-defense. *See* [ECF No. 7-2 at 200:12–20]. Therefore, Haddad's failure to get Williams to testify in the trial or to memorialize his statements were not decisions that any reasonable competent trial counsel would not have also made. *See Chandler v. United States*, 218 F.3d at 1315 ("[F]or a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

It is for these same reasons that Petitioner was not prejudiced under *Strickland*. "Counsel is not required to present cumulative evidence or evidence incompatible with the defense strategy." *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009); *see also Yisrael v. Sec'y, Fla. Dep't of Corr.*, No. 3:15-CV-1360-J-34JRK, 2018 WL 5014553 (M.D. Fla. Oct. 16, 2018) (finding that "a

17

reasonable defense attorney" could have decided not to present records because they would have undermined defendants defense theory).

Moreover, "Florida law forbids a party from calling a witness solely to impeach that witness with a prior inconsistent statement." *Cardona*, 681 F. Supp. 3d at 1305. Petitioner argues that Haddad was not limited to calling Williams as a witness at trial solely to impeach him with his prior statement. [ECF No. 11 at 7]. However, Haddad stated that Williams testified during the proffer opposite to both his sworn statement and a conversation he had with Haddad outside of the courtroom:

> Q: Okay. Now, when Joseph appeared for trial, were you able to talk with him prior to him coming in for court?
> A: Yeah.
> Q: And was he cooperative at that time?
> A: He was cooperative about the fact that [Khan] had done drug deals back in Miami, which I was going to try to get in at least something to give me something to argue, and the other stuff that he talked about.
> . . .
> Q: So he was consistent with his sworn statement to the police?
> A: Yeah. Consistent with that. That's the best I could get.
> Q: Okay. So what happened when he comes into court?
> A: He saw Mr. and Mrs. Khan, and that's what happened was in the transcripts. He said he never said what he said. He said he was drunk that whole day and all that other stuff.
> Q: So he completely changed his story?
> A: I don't know if he changed his story. He didn't give a story.

[ECF No. 7-4 at 103:19–104:17]. Specifically, when Haddad questioned Williams during proffer, Williams testified that:

> Q: Do you know whether or not he sold drugs?
> A: No.
> Q: You don't know?
> A: I don't think so.
> Q: Did you ever see him sell drugs?
> A: No.
> Q: Did we just have a conversation outside and you said he sold Xanax?
> A: No, I said he, I know he came from a rough neighborhood when he was younger.

Q: Yeah. And just outside when we were talking – well let me ask you this, did he steal Xanax from you?
A: I don't remember, it's been about two years ago.
Q: Didn't you just tell me outside you remembered and he took the bars and you saw him with the bars that day?
A: No, that's not what happened.
. . .
Q: Oh, as a matter of fact you stated to us that this was as far as you knew a drug deal gone bad with Omar, correct?
A: No, I said I was on the news that day intoxicated and I don't really remember what had happened because I was not there unfortunately.
Q: Didn't you just tell me outside and tell us yesterday and the other day that this was a drug deal gone bad?
A: That's what I asked you. I said is that what it was?

[ECF No. 7-3 at 14:5–15:13].

Thus, Williams' proffer was opposite to his sworn statement to investigators that Khan had stolen his prescription pills, that Khan had previously sold drugs, and that Khan had previously given/sold drugs to Williams. *See* [ECF No. 6-2 at 12–33]. Thus, if Haddad was permitted to call Williams as a witness, the only known witness who might testify as to Khan's circumstances (as Petitioner suggests), Williams' proffered testimony indicates he would testify contrary to his previously sworn testimony. *See* [ECF No. 7-3 at 14:5–15:13]. Therefore, to admit Williams' sworn statements that he was aware of Khan's circumstances, he would have had to call Williams, for the sole purpose of impeaching him with his prior inconsistent statements. Under Florida law, Haddad would not have been permitted to do so. *See Cardona*, 681 F. Supp. 3d at 1305; *see also Eugene v. Jones*, No. 3:15CV0073-MCR/CAS, 2017 WL 4228898, at *9 (N.D. Fla. Feb. 16, 2017), *report and recommendation adopted*, No. 3:15CV73-MCR/CAS, 2017 WL 4226143 (N.D. Fla. Sept. 22, 2017) ("Under Florida law, it is improper to call a witness 'merely as a device to place the impeaching testimony before the jury.'" (quoting *Bearden v. State*, 161 So.3d 1257, 1265 (Fla. 2015)).

19

In sum, the state appellate courts' rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.[2]

C. Claim 3: Failure to Object to Video

Third, Petitioner argues that trial counsel was ineffective for failing to object to an inflammatory video of Petitioner. The video in question depicts the Petitioner smoking cannabis, listening to rap music, and holding and pointing a pistol at the camera. [ECF No. 8]. Petitioner states that "[t]he depiction of prior drug use was blatantly immaterial and prejudicial. Pointing a firearm at a camera is an inherently threatening act towards all who may see the footage. Other than to sully the Petitioner's character, this evidence brought no probative value." [ECF No. 1 at 20]. Petitioner argues that "[n]o objection was imposed and the Petitioner was painted as a violent, threatening thug[,]" and therefore, "Petitioner's defense was thoroughly prejudiced." [Id. at 21]. Petitioner also argues that he was "insurmountabl[y] prejudice[d]" because there was "no attempt by defense counsel to stipulate/admit or sever Petitioner Morris' weapons charge from the second-degree murder count." [Id. at 20].

---

[2] Petitioner also takes issue with the state appellate court's opinion that he was not prejudiced by Haddad's handling of Williams as a witness, and that it was contrary to the record. See [ECF No. 1 at 16–18]. Namely, the appellate court, in evaluating the prejudicial effect of Williams' non-testimony, noted that the state conceded that Khan was "probably" selling drugs to Petitioner on the date of the shooting, and thus Williams' testimony was unnecessary. See [ECF No. 1-2 at 10]. Putting aside the fact that the state did acknowledge that it was "probably the case" that Khan was at the scene to do a drug deal, see [ECF No. 7-3 at 256:19–23], even if the state appellate court had erred in this instance, Petitioner's argument would still fail as he has not shown enough evidence that the prejudice was so substantial that the outcome of the trial would have been different. See Strikland, 466 U.S. at 691 ("[E]rror by counsel . . . does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). Here, calling Williams as a witness would still have included improper character evidence, been contrary to the defenses self-defense strategy, or been for the improper purpose of impeaching the witness to admit a prior inconsistent statement.

Respondent argues "[t]he video of Morris sitting in a chair smoking and pointing a gun at the camera was relevant to prove the charged crimes of second-degree murder with a firearm *and* possession of a firearm with a serial number removed." [ECF No. 5 at 36]. Further, Respondent states that the video has a "probative value in linking the firearm to Morris, to prove Morris's knowledge of its status as a firearm with a removed serial number [and] is not substantially outweighed by any unfair prejudice." [*Id.* at 38]. The Respondent argues that the firearm found at the scene and the firearm depicted in the video contained similar characteristics, demonstrating Petitioner's familiarity with the firearm. [*Id.* at 37].

In his reply, Petitioner states "[t]he video . . . had no bearing on Morris' knowledge about the firearm nor his knowledge that the object was a firearm." [ECF No. 11 at 8]. Petitioner also argues that Respondent's "arguments that Morris' knowledge about the firearm or knowledge of its status as a firearm are misleading and hollow." [*Id.*].

Petitioner raised this claim in his Rule 3.850 motion. [ECF No. 6-1 at 160–62]. The state appellate court rejected it and determined that the issue was "whether an appellate court would have found reversible error if Haddad had properly objected." *Morris*, 382 So.3d at 726–27. The state appellate court found that "[i]f the trial court would have admitted the video into evidence over a proper objection, the appellate court would likely have either determined no abuse of discretion or found harmless error given the other photos admitted as evidence." *Id.* at 727.

As an initial matter, Petitioner's severance argument, which he presented with his argument that counsel failed to object to the video, fails because counsel is not deficient for failing to request a severance where the charges were not improperly joined. *See Bradley v. Sec'y, Fla. Dep't of Corr.*, No. 17-12926-K, 2018 WL 3238836, at *15 (11th Cir. Apr. 2, 2018).

Next counsel is not ineffective for failing to raise a non-meritorious objection. *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). "Failure to raise a meritless issue cannot prejudice a client." *Lara v. United States*, No. 4:10-CR-484-VEH-JHE, 2015 WL 5602440 at \*5 (N.D. Ala. Sept. 23, 2015) (citing *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir.1992)); *see also Brown v. United States*, No. 09-20468-CR, 2014 WL 12908725, at \*13 (S.D. Fla. July 2, 2014), *report and recommendation adopted*, No. 12-23704-CIV, 2014 WL 12908724 (S.D. Fla. July 28, 2014) ("The law does not require counsel to raise every available non-frivolous defense.").

Under Florida law, "[r]elevant evidence is evidence tending to prove or disprove a material fact," and "[a]ll relevant evidence is admissible, except as provided by law." *See* Fla. Stat. §§ 90.401–402. Here, the video of Petitioner was relevant to both the weapons charge and the second-degree murder charge. Detective Jason DeLuca found a firearm pushed under a fence that Petitioner was seen running towards after the shooting had taken place, and where his vehicle briefly stopped after fleeing the scene. *See* [ECF No. 7-1 at 333:15–339:14]; [ECF No. 5 at 8]. The firearm found by Detective DeLuca was a pistol with characteristics very similar to the firearm in the video. [ECF No. 6-1 at 238]. Specifically, the firearm found was a 9 mm pistol with a silver slide, black grip, black muzzle, black magazine with red over the frame and trigger guard. *See* [ECF No. 5 at 37]; *see also* [ECF No. 6-1 at 230–38]. This provides relevant evidence to the weapons charge and the argument that Petitioner had knowledge that the firearm had been altered. *See* Fla. Stat. § 790.27(2)(a) (listing elements for crime of possession of unlawfully altered firearm). The video is also relevant to the second-degree murder charge as it links Petitioner with the firearm that was abandoned and ultimately found by Detective DeLuca. *See Lightfoot v. Sec'y Dep't of Corr.*, No. 807-CV-2179-T-17TBM, 2009 WL 2973661 at \*8 (M.D. Fla. Sept. 11, 2009)

22

("In Florida, the reviewing court will not disturb a trial judge's ruling regarding the admissibility of photographic evidence absent a clear showing of abuse of discretion.").

As to prejudice, the state appellate court did not unreasonably apply *Strickland*. As noted by the appellate court, while the probative value of the video was low because Petitioner does not dispute that he shot Khan and the serial number is not visible in the video, the risk of unfair prejudice was also low considering the other photos of Petitioner smoking and brandishing a similar firearm that were admitted into evidence despite trial counsel's objections. *See* [ECF No. 6-1 at 241–50]; *see also Morris*, 382 So.3d at 727. Indeed, pictures of Petitioner smoking cigarillos and brandishing a similar gun with a silver slide, black grip, and black muzzle were also admitted into evidence at trial. *See* [ECF No. 6-1 at 241–250]; *see also Torrez v. State*, 294 So.3d 390, 405 (Fla. 4th DCA 2020) (admission of cadaver dog evidence not unduly prejudicial in light of other already admitted state evidence). Therefore, because the danger of unfair prejudice is not *substantially* outweighed by its probative value, an objection to the video would be without merit and trial counsel cannot be deemed ineffective.

Moreover, even if the video of Petitioner was excluded from evidence, Petitioner has not provided any evidence that the outcome of the trial would have been different. Again, photographic evidence of Petitioner with a similar firearm, smoking, and pointing the firearm were also admitted into evidence. *See* [ECF No. 6-1 at 241–50]; *see also Morris*, 382 So.3d at 727. Therefore, Petitioner cannot establish the prejudice prong of *Strickland*. *See Harold v. Sec'y, Fla. Dep't of Corr.*, No. 3:16-CV-888-J-34JRK, 2019 WL 763592 (M.D. Fla. Feb. 21, 2019) (finding that the petitioner could not "demonstrate prejudice; therefore, his claim of ineffective assistance of counsel is without merit").

23

In sum, the state appellate courts' rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts.

### D.  Claim 4: Cumulative Effect of Errors

Finally, Petitioner argues that trial counsel was ineffective due to the cumulative effect of counsel's errors. As stated in the previous sections, the state appellate court reasonably denied his claim because all of Petitioner's claims are without merit, and his claim that he was prejudiced due to cumulative error must fail. *See e.g., United States v. Taylor*, 417 F.3d 1176, 1183 (11th Cir. 2005) (finding no cumulative error where there were no errors in the lower court's rulings); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) (stating when addressing a cumulative error argument that "[t]wenty times zero equals zero").

## V.      EVIDENTIARY HEARING

In a habeas corpus proceeding, the burden is on the Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011) (citing *Dickson v. Wainwright,* 683 F.2d 348, 351 (11th Cir. 1982)). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016), *cert. den'd*, 137 S. Ct. 2245 (2017). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted here.

### VI.   CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a COA only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the Petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record, this court should deny a COA. Notwithstanding, if Petitioner disagrees, he may move for such certificate.

### VII.   CONCLUSION

Based upon the foregoing, it is **RECOMMENDED** that the petition for habeas corpus [ECF No. 1] be **DENIED**; that no Certificate of Appealability Issue; that final judgment be entered; and that the case be closed.

A party shall serve and file written objections, if any, to this Report and Recommendation with the District Judge within **FOURTEEN DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal

conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

   **SIGNED** this 14th day of July, 2026.


        LISETTE M. REID
        UNITED STATES MAGISTRATE JUDGE

cc:  **All Counsel of Record**

26